Mr. Lieberman, whenever you're ready. Thank you, Your Honor. Chief Judge Prost, and may it please the Court, my name is Steve Lieberman. I'm counsel for appellant cxLoyalty with respect to the substitute claims. As an initial matter, there's an issue that took up a substantial amount of the briefing to this Court that I think has now been finally resolved. Specifically, this Court on November 17 issued its decision in SIPCO v. Emerson Electric, which now definitively resolves the point that the PTAB's decision that the patent entered qualified for CBM review is not appealable. So I don't intend to address that point during argument unless any panel members have questions. I'd like to then move to the ineligibility of the substitute claims. My first point is that the substitute claims on appeal are directly addressed by this Court's decision and the University of Florida Research Foundation case. That is a case in which the Court held, and this was the language from the holding, neither the 251 patent, the patent in that case, nor its claims explain how the drivers do the conversion. This was a case where the issue was whether or not a conversion step rendered a claim eligible. And the word how was actually underlined in the original by the Court. And that's exactly what we have here. So Mr. Lieberman, it might be helpful for me to know what led the Board astray in your view to conclude that these amendments were okay. Right. So I think the answer is fairly simple, and there are two parts to it, Your Honor. The first is that the Board was faced with example 42 of the PTO guidelines, which had issued after the initial decision, but before this Court's ruling in University of Florida. In example 42, the PTO, in its guidelines, gave an example of a claim involving a conversion step, and said because of that conversion step, the claim was eligible. During the oral argument, we talked about example 42, and I made very clear that example 42, if it applied at all, was no longer good law in light of this Court's decision in UFRF. The panel said quite clearly that it was bound by example 42. Now, to deal with example 42, which had conversion language very similar to what we're talking about here, the Court went through in a fair amount of detail and distinguished the substitute claim from the claim that was found eligible in example 42. And this was in the context of Alice Step 1, which the PTAB calls Step 2A Prong 2. And the Court made specific findings that allowed it to distinguish the claim here from example 42. However, when the Court got to Alice Step 2, which it calls Step 2B, the Court wholly ignored the University of Florida decision, which addressed both Alice Step 1 and Alice Step 2, and said that when you're dealing with the particular example where there was a claim with a conversion step, that the conversion step does nothing to change the ineligibility of the patent claim unless it describes how the conversion occurs. In this case, the evidence is, and I would say the evidence is actually undisputed on this. You can look at the claim, and you can look at the specification of the patent, and you can look at two admissions that were made by Meritz's counsel during the trial. And they're at A941 and A947. The evidence is undisputed that there was nothing in the specification and nothing in the claim that described how you converted information in the format of, let's say, a vendor, an airline or a hotel room provider, to the format that could be read by the GUI of a loyalty program participant. It's not in the claim. It's not in the specification. And during the argument, when the panel asked Mr. Evans, Meritz's counsel, about this, Mr. Evans admitted that the conversion was a well-understood, routine conversion. It was not a specific type of conversion, and it was a conversion that people of skill in the art knew how to accomplish. There didn't have to be a description of how the conversion would occur. And, of course, he had to say that because there are no details in the patent. So you have the claim, you have the specification, and you have the admission at A941 and A947. What the court then did, I'm sorry, what the PTAB then did is it made inconsistent and contradictory findings. At pages A80 of the appendix, which is page 80 of the final written decision, the PTAB made very specific findings under ALICE Step 1. For example, the PTAB held that the 087 patent does not describe a technical problem, that it does not describe the converting process of solving a technical problem, that it does not describe the converting process as providing a technical solution over the prior art, and it held that the specification of the patent had a lack of detail regarding the technical problem or the technical improvement. If you then compare that to the findings at A9- Counsel, this is Judge Hughes. Can I just interrupt a minute? In my understanding, is the problem here really that they just don't describe how to do the conversion, that if they had an algorithm or some structure in the specification that supported it, that explained how technologically it was achieving it, that that might be not an abstract idea, that it might follow along, for instance, like the algorithm in Infish or other cases like that, like DDR. The problem is they've just put in the idea of conversion, which is not patent eligible. That's exactly correct. That's exactly correct. I think the perfect analogy is let's say that I'm traveling to Europe and I plan to go to both France and to Germany, and I can't speak either French or German, which I can't. I have enough trouble with English, and I want to use an electronic device to help me speak to people in those countries. If there were a patent which said, I claim a translation engine to translate English to French and French to English and English to German and German to English, but doesn't say how one does that, that would be ineligible. If you had a patent where the specification said, here's exactly how you would do that, that certainly could be patent eligible. And here the PTAB made very clear that the idea of and ways of doing data conversions were well-known, were well-known and conventional. So you have a step with no explanation and no details. Going back to Chief Judge Prost's point, why did the PTAB make the error? I think in part the PTAB made the error in addition to the fact that it simply did not apply UFRF or the four other cases from this court which hold essentially the same thing. Interville, Affinity, Intellectual Ventures, and Amaranth. And maybe they didn't apply UFRF because they didn't want to essentially hold example 42 to be not good law. The panel focused on the fact that we did not provide expert testimony in rebuttal with respect to the substitute claims. Our view was and is that there was no reason to do that because there was simply nothing in the specification, nothing in the claims, and nothing in the conclusory declaration of their expert, Mr. Wiener, that required any sort of rebuttal. And in fact, you can search the Wiener Declaration and with respect to the conversion step, you will find nothing in which Mr. Wiener can point to any sort of technical details as to how the conversion occurred. Now Meritz waves its arms in its brief. I guess I mixed my metaphors. I don't know how you wave your arms in a brief. But Meritz refers to the Wiener Declaration with broad swaths, 15 or 20 pages. For example, they refer to appendix at 1661 to 1671 and say there Mr. Wiener talks about the details of conversion and how that is and what the details are. But if you look at those pages, you'll only see a reference to conversion at paragraph 88 on page A, 1668. And there, there are no details, nothing about how the conversion works. Thank you. I'd like to reserve the remainder of my time if the panel has no questions. Yes. Yes. Thank you. Let's hear from the other side, Mr. Evans. And Mr. Evans, you might begin by letting us know if you concur with Mr. Lieberman's observation that the CIPCO decision kind of elided the arguments about CBM review. Thank you, Judge Post. May it please the court. I'm Robert Evans here on behalf of Meritz Holdings. With regard to the CIPCO decision, I agree that if you apply the bright line rule in CIPCO to the facts of our case, that review of the CBM institution decision is off the table. I agree with that. I would point out a couple things. One, that decision is still subject to request for reconsideration and appeal to the Supreme Court. Secondly, the Thrive decision on which it was based concerned a timing question. The question was, was a petition timely filed, which did not require further factual development? Here, by contrast, the issues underlying the decision had significant additional factual development and were extensively discussed in the final written decision of the board, and it was that final written decision of the board that we were appealing. And so I think factually there are some differences here between what happened in our case, what happened in Thrive, but I agree that the CIPCO court laid out a very bright rule, and if you apply that rule to the court. Which we abide by unless it's ever overturned by the Supreme Court, right? Yeah. I would also note that there's no issue preclusion or residue, those kinds of things, because we didn't get to appeal it. But anyway, so yeah, I guess that's my answer. Further questions there, or should I move on? I'm speaking for myself. Why don't you move on to the main appeal? What I would like to point out, first of all, the Director of Court's attention to is the second step of Alice, and in particular the question of whether or not there's an inventive concept here in the patent claims. And I think where the board and opposing counsel went in the wrong direction is they simply ignored the hidden account. The testimony was unequivocal that if you look at all of the elements of the claim, the combination of those elements was novel, it was not obvious, it was not well understood, it was not routine, and it was not conventional. I don't think anybody disputed that. Mr. Wiener, the expert for merits, he was a Princeton computer scientist. He worked at the leading companies that built these systems back in the day in 2000. He explained at great length how they tried to get the costs out of programs by moving them to the Internet and couldn't because there were technical barriers to that, and that the claims and the patent here solved those problems. And so his testimony was not only from the perspective of looking at the claims and the patent and the art, it was cited by CX Loyalty, but also from his own experience in the day. And, again, he was from Princeton, very smart gentleman. He worked at Brierley, who was working on the leading accounts at the time, American Airlines A Loyalty Program. Many of them. They're set forth in his declaration in paragraph 60 to 70, and also paragraph 38, where he discusses that history. Cast against that is the testimony from CX Loyalty's expert, Mr. Knowles. He's been a senior vice president with CX Loyalty. He's clearly an interested witness. He's worked for them for 15 years. He dismissed the hidden account as nothing more than information. He dismissed that in paragraph 132 of his declaration. He called the hidden account nothing more than information. And so he said since it didn't count, he wasn't going to look at it, and he then just considered the other elements of the claim in isolation. He never considered the combination. He just looked at the individual elements. And as this court knows, you have to look at all of the elements of the claim in deciding whether or not something is well understood or conventional or those kinds of tests. The McRow case, the Baskin case, the Selspin case, they all stand for that proposition. The two pieces of priority he did cite, the 176 patent and the 283 patent, they just concern computer reservation systems for airlines. They had no hidden accounts. They had none of the features of the combination of the claim. The board in its final written decision at page 51, it discussed these concepts for a while, and it kept denying the hidden account as a technical component, but then finally it had to admit at page 51 of the final written decision that eligibility and novelty are separate inquiries from the section 101 novelty. I'm sorry to interrupt, but I've been trying to follow your argument, and maybe it's just I'm missing something. When we're talking about the hidden account, the claims don't require that the actual dollar amount of the transaction be hidden from the participant, right? And the specification doesn't even discuss what now it seems you're saying is a purportedly important aspect of the invention. Am I right about that? No, I submit that Mr. Wiener gave his declaration where he testified that a person of ordinary skill in the art reading the spec and knowing that the account is hidden from the participant, which is required by the claim, that if you hide the account from the participant, you obviously hide the information in the account from the participant. And Mr. Wiener testified that a person of skill in the art reading this claim would appreciate that since a loyalty program has to work where the participant doesn't know what's actually being paid, otherwise the perceived value drops. The loyalty program doesn't work for its intended purpose. And a person of skill in the art reading the claim would appreciate that, that when you say you have a hidden account, obviously the values in the account are also hidden from the participant. That was another place I believe where the board misunderstood or misstated the record because everybody knows that to run a loyalty program, you have to deliver more perceived value than it costs to you. It's sort of an inherent characteristic of running a successful program. So the board, in looking at these things, it dismissed the hidden account as a non-technical element, didn't look at the combination, and it just said eligibility is different than novelty and non-obviousness are separate inquiries. And I submit that was an admission by the board or a statement or an understanding by the board that they didn't find any prior art and they didn't find all of this combination of elements to be bold or understood. So here we have a situation where there's oral testimony from an interested witness about things 20 years ago. The barbed wire fence case would tell you that is inherently unreliable for purposes of validating a claim. Cast against someone who lived back in the day, asserting absolutely that this combination of elements was novel and non-obvious, was not well understood, was not routine, was not conventional. And so you have a dearth of evidence on one side, you have substantial credible evidence on the other side, and the party with the dearth of evidence also has the burden of proof. Mr. Wiener's second declaration went unrebutted. Both declarations did, but the second one in particular, because after neither declaration, both of which came after the declaration of the interested witness, Mr. Knowles, both declarations he was not deposed, there was no further evidence submitted to rebut those points, and he asserted very clearly that the combination of elements was novel and non-obvious. There's no preemption issue here because, as stated, these claims require a hidden account, and so there's not some kind of a broad preemption issue to worry about. And it's also, since the hidden account is not a computer element, it's not a conventional computer element, this isn't the kind of case where you say, hey, there's just a collection of standard computer components, and therefore we have to decide it's not patent eligible. With regard to the question of how do you make the conversion, the, quote, admission that Mr. Lieberman was suggesting that I made during the hearing was not nearly the admission he'd have you believe that it was. What I said there was in the context of the disclosure in the patent, figure three and figure four, which was what was being discussed at the time during the hearing, that a person of skill in the art would understand how to go from that disclosure and complete the conversion. If you look at Mr. Wiener's second declaration at paragraphs 28 through about 35, he explains in great detail how a person of ordinary skill in the art would read the spec, would be given the guidance to use that specification to make the conversion, would know how to do it based on the guidance in the specification, and so this idea that the specification is devoid of how to do this is simply not accurate. Counsel, this is Judge Laurie. You're defending the patentability of the substitute claims. No one has used the word substitute claims and original claims, which would have been aided clarity, but your cross appeal deals with the original claims. Would you address that a little bit, please? I believe that everything that I've said to this point addresses both sets of claims because the original claims also had the hidden account. The original claims, Mr. Wiener testified at great length, I give you those quotes, that the combination of those elements was novel, was non-obvious, was not well understood, was not routine, was not conventional because the combination of elements, including the hidden account, as recited in the original claims, that combination of elements is novel. Mr. Knowles, the expert for CX loyalty, dismissed the hidden account as not being a technical component, just information. The board found it was not a technical component and ignored it, but when you look at the elements in combination for the original claims, that combination of elements is found nowhere in the prior art and their expert doesn't even say it's found in the prior art. He just says, I'm not going to talk about the hidden account because I don't think it counts. I'm going to talk about the other four elements in isolation. So he blew it from considering the elements in isolation, he blew it from ignoring one of the elements, and he never considered the combination. So you have the unrebutted testimony of Mr. Wiener, who was an independent expert who worked in the day, who worked with the leading companies in the day, who says both the original claims and the substitute claims were novel and unobvious and not well understood and not routine and not conventional in view of the art of the day. I see I'm into my reserve time, so unless there's questions, I will reserve the remainder. Okay. Let's turn back then to Mr. Lieberman. Thank you, Your Honor. Your Honor, I went to Princeton, and while I appreciate all of Mr. Evans' comments about Princeton grads, my experience indicates that a Princeton grad is not entitled to any degree of infallibility with respect to patent or any other issues. Let me turn to hidden program account in Your Honor's question and first preface the point by saying that the hidden program account is probably very close to the classic shadow records example from the Alice case. What is a hidden program account? A hidden program account is an abstract idea. All it is, as Maritz's briefs made very clear and as the PTAB appropriately found below, is the idea that you do not let the consumer know what the loyalty program paid for the airline ticket or the hotel room. That is, you make the consumer think that if he or she traded in a hundred points, that he or she got a hundred points worth of an airline ticket. This is nothing different than what merchants on the piers of the markets at Tyre in Lebanon, in Venice in the Middle Ages, in Chaucer, what any merchant does. No merchant will tell a customer, by the way, I'm sorry, but let me interrupt you just for a minute just because time is short. I wondered if you could respond. Your friend spent quite a bit of time dealing with the expert testimony about novelty and the first, and it seems to me the argument against that is that it invokes the testimony, invoked unconventionality only in the sense the claimed subject matter as a whole was novel because the inventors were the first to apply this abstract idea using conventional techniques. And that clearly is something different than what we look to in step two of our analytical framework. So I wondered if you could explain or have any comment on that. Of course, I think Your Honor's comment is exactly correct. That what Mr. Evans is trying to do is a 102 and 103 analysis for a case in which 102 and 103 was not raised. Taking an abstract idea like the idea of not disclosing to a consumer what the loyalty program actually paid for the hotel rooms, even if you layer onto it an Internet connection and a server and a GUI and an API, that doesn't do anything with respect to Alice step one or Alice step two when we're talking about the original or the substitute claims. All it does is add details to and narrow the scope of an abstract idea. And it does not matter one whit under this court's analysis whether taking an abstract idea and doing it on a computer had ever been done before or not. Two other points I wanted to make quickly, Your Honor. In the appendix at page 912, that's the site for the PTAB making clear during the argument that at least the one PTAB judge who was speaking felt that he was not able to hold example 42 to be no longer good law in light of UFRF. And my concluding point is that there are two entirely different ways that this court can reverse the PTAB with respect to the substitute claims. One is the failure to follow University of Florida and the four other federal circuit cases on point. The second is that under the D.C. circuit's decision in A&R and under this court's decision in poly rep, when you have inconsistent findings by an administrative agency such as the PTAB, that as a matter of law means that there is no substantial evidence. So there are two fully independent and sufficient bases upon which this court can and I submit should reverse the PTAB with respect to the eligibility of the substitute. Thank you. If the court has no further questions. Okay, we'll turn back to Mr. Evans then and your rebuttal is exclusively related to your cross appeal which dealt with the original PTAB decision. Correct, we all agree with that? Yes. Okay, please proceed. I'd like to just first address the idea that conventional computer elements combined in a non-conventional way are patent eligible as an inventive concept. That's been the holding in the Baskin case, the South Bend case, the McGraw case. Here we don't even have all conventional computer elements. We additionally have a hidden account which is not a conventional computer element. So all the more here we have an inventive concept that's patent eligible and on that basis I submit this court should reverse the board's decision. The original claims were not patent eligible and we should proceed on the original claims in the underlying lawsuit. At minimum the substitute claims are patent eligible and we should go forward on that basis at least. I'd like to address the question of the shadow records in Alice. The shadow records in Alice were nothing like the hidden account here. The shadow records in Alice were two separate shadow records set up by a third party who shadowed each side to a future potential transactions account. They shadowed the actual account and the shadow account was supposed to be identical to the actual account and the third party maintained a shadow account for each side of the transactions. There were two shadow accounts. At the end of the day, each of the shadow accounts were supposed to track the actual account and then the intermediary would tell the two parties, party A and party B, hey, the first three transactions are fundable by both sides because there's assets there to close them and the last two maybe not because there don't appear to be the assets there to fund them according to our shadow account analysis. The first three transactions have been closed for dollar values and for consideration that both parties would fully understand. The last two transactions would not close because the shadow account indicated that one party or the other could not perform. In sharp contrast here, the shadow account is not understood by the participant. The shadow account never knows what's actually paid in dollars for the goods and services they're buying. They just know that they gave up points. As a result, the shadow account here is very different than the accounts that were used in Alice. I think that also confused the board because the board thought those accounts were the same. They're not. They're very different in how they function, how they work. The issue that merchants all the time have not disclosed what they've paid for things, that supports our position. It supports our position because as Mr. Wiener explained in his declaration, a person of ordinary skill in the art reading these claims would appreciate that that hidden account would hide the dollar value from the participant so that the program could conduct a successful loyalty program. The perceived value would be higher than the actual cost, and that's what drives the loyalty program. Unlike the past, here the participant gets to shop around directly with the vendors and gets to shop from one vendor to the next to the next and decide what they want to buy. It's a much better program. It works differently than the old way where you had to talk to the program administrator who then talked to the vendor to make a redemption. It's overcoming the technological hurdle that the Internet was just too transparent. It told the participant too much information, and therefore it wasn't available as a loyalty redemption vehicle. Mr. Wiener who worked in the day, worked with the leading companies in the day, none of them could solve the problem. It took Merit's patented technology to overcome that problem. So I submit that this is a significant technological improvement. This was not routine. It involved components that were not routine. Unless there's questions, I see I'm out of time, I will conclude. Thank you. Thank both counsel and the cases submitted. Thank you, Your Honor.